UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HILDA L. SOLIS, Secretary of
Labor, United States Department
of Labor,

   Plaintiff,

v.          Case No. 8:09-cv-1726-T-33AEP

FLOYD W. SEIBERT,

   Defendant.

_____/

**<u>ORDER</u>**

  This cause comes before the Court pursuant to Hilda L. Solis the Secretary of Labor's Motion for Summary Decision Without a Hearing (Doc. # 36), which was filed on September 21, 2010.  Pro se Defendant Floyd W. Seibert filed a Response in Opposition to the Motion for Summary Judgment (Doc. # 40) on October 15, 2010, and the Secretary filed a Reply (Doc. # 42) on October 27, 2010.  For the reasons that follow, the Court grants the motion for summary judgment in this ERISA case.

**I. <u>Background</u>**

  Seibert owned and was the President of Central Home Care Services, Inc. and caused it to sponsor the Central Home Care Services, Inc. and Affiliates 401(k) Plan. (Doc. # 36-1 at ¶ 7).  Seibert was the Plan Administrator and sole Trustee of the Plan until April 4, 2007. (<u>Id.</u> at ¶ 9; Seibert Dep. Doc.

# 37 at 11; Case No. 5:06-cv-1330 Doc. # 44).[1]

Seibert also owned and was the President of Central Texas Home Health Services and Central Oklahoma Care at Home. (Seibert Dep. Doc. # 37 at 89-90). In addition, Seibert owned and controlled Western Medical Supplies and Equipment, Inc. and Extended Care Services. (Id. at 90-92). Furthermore, Seibert owned Dixie Diamond Ranch and Rio Frio Outfitters. (Id. at 95-96, 99).

At times, Seibert used an alias, Martin Mesquite. (Id. at 12). "Martin Mesquite's fictitious identity . . . was supported by information and/or documents in [Seibert's] possession, such as a photograph of an employee who worked for [Seibert] in Largo, Florida, the address of one of [Seibert's] siblings, and the social security number of [Seibert's] deceased father." (Doc. # 37-1 at 16, ¶ D). Seibert, under the alias Martin Mesquite, acted as the Managing Director of a Nevada shell company known as Health Care International Holdings, Inc., which was incorporated on October 20, 1998. (Seibert Dep. Doc. # 37 at 12, 46). Health Care International Holdings, Inc. had de minimis assets and only interest income. (Id. at 44, 51-52, 57).

---

[1] As will be discussed below, due to Seibert's criminal activities, a District Court judge sitting in Oklahoma removed Seibert and appointed a Successor Trustee for the Plan.

2

In addition, Health Care International Holdings, Inc., had only one bank account –- the account was opened in 1999 and closed in 2006. (Id. at 54, 100; Doc. # 36-1 at 3, ¶ 17). Seibert, under the alias Martin Mesquite, had signatory authority on Health Care International Holdings, Inc.'s bank account. (Seibert Dep. Doc. # 37 at 42, 54, 100, 115-116). Further, Seibert, as Martin Mesquite, signed checks on Health Care International Holdings, Inc.'s bank account (Id. at 115) and handled all interactions between Health Care International Holdings, Inc. and the aforementioned entities owned by Seibert. (Id. at 71).

Seibert used approximately 3.85 million dollars of the Central Home Care Services, Inc. and Affiliates 401(k) Plan assets to purchase worthless Health Care International Holdings, Inc. "bonds." (Doc. # 36-1 at 3, ¶ 18).[2] Seibert effected this overall transaction via 19 individual wire transfers from the Plan's bank account to Health Care International Holdings, Inc. between April 1999, and October 2001. (Seibert Dep. Doc. # 37 at 60-69). Seibert, as the Plan Trustee, signed the Health Care International Holdings, Inc. bonds that he purchased with Plan asserts. (Id. 150).

---

[2] Technically, Health Care International Holdings, Inc. was not registered or authorized to issue corporate bonds or other securities.

As soon as Health Care International Holdings, Inc. received Plan assets for the worthless Health Care International Holdings, Inc. bonds, Seibert caused Health Care International Holdings, Inc. to loan the money to entities owned and controlled by Seibert, entities that Seibert refers to as his "agencies." (Id. 79-80, 84).  As noted, Seibert continued these transactions until 3.85 million of Plan asserts had been siphoned off into entities under his personal control. (Id. 93).

Health Care International Holdings, Inc.'s bank records establish that it repurchased $524,000.00 worth of Health Care International Holdings, Inc. bonds from the Plan between 2000 and 2005. (Doc. # 36-1 at 4, ¶ 22).  In addition, Health Care International Holdings, Inc. paid the Plan $224,370.14 in interest on the Health Care International Holdings, Inc. bonds. (Id.)  The amount of interest currently due and owing to the Plan is the total amount that accrued ($1,478,031.78) minus the amount of interest previously paid ($224,370.14), which yields the sum of $1,253,661.64.[3] (Doc. # 36-1 at 4, ¶¶

---

[3] The interest rate applied by the Employee Benefits Security Administration to yield this amount is 8%.  The Secretary arrived at that rate by averaging the interest on the bonds. (Doc. # 36 at 10, ¶ 47).  The Secretary explains that the Employee Benefit Security Administration "calculates lost opportunity costs based on the higher of actual interest owed or the Internal Revenue Code underpayment rate, which

23-26).  Seibert has neither objected to the amount claimed as lost opportunity costs, nor the interest rate applied in order to arrive at such costs.

Due to the foregoing prohibited transactions and others, Seibert was charged with, and pled guilty to, health care fraud and embezzlement.  Specifically, Seibert pled guilty to health care fraud under 18 U.S.C. § 1347 pursuant to a plea agreement, on January 12, 2006, in case number 4:04-cr-251, in the United States District Court for the Southern District of Iowa.  Thereafter, on September 11, 2006, Seibert pled guilty to theft/embezzlement from an Employee Benefit Plan under 18 U.S.C. § 664 pursuant to a plea agreement, in case 8:06-cr-373, in this Court.  After Seibert executed the September 11, 2006, plea agreement, this Court transferred his case to the United States District Court for the Southern District of Iowa. (case number 8:06-cr-373 Doc. # 5).[4]

In addition to incarceration, the final judgments of conviction in the criminal cases required Seibert and co-defendant James Golden to make restitution payments.  As noted

---

fluctuated between 4% and 9% since 1999." (Id. at ¶ 46).

[4] In addition to entering into plea agreements, Seibert also entered into a series of "tolling agreements" with the United States Department of Labor in which the statute of limitations applicable to any civil ERISA action against Seibert was tolled. (Doc. # 41-2 at 1-14).

above, a small portion of the bonds was redeemed, but the Plan was left holding $3,281,199.22 in worthless bonds. (Doc. # 22 at 2).  Therefore, Seibert's sentence included the requirement that he pay off the remaining worthless bonds in criminal restitution.

On August 24, 2009, the Secretary of Labor brought this action against Seibert, under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2),(5). (Doc. # 1).  Separate and apart from the criminal restitution payment requirements noted above, the Secretary seeks lost opportunity costs in the amount of $1,253,661.64, incurred as a result of Seibert's fiduciary breaches.  In addition, the Secretary seeks an order that allows Seibert's Plan account to be offset until the amount of lost opportunity costs noted above is satisfied. (Doc. # 1 at 5; Doc. # 36 at 20-21).[5]

On September 21, 2010, the Secretary filed her motion for summary judgment (Doc. # 36), indicating that she has met her burden to prove as a matter of law that Seibert breached his fiduciary duties resulting in the Plan losing $1,253,661.64

---

[5] The complaint also sought a permanent injunction barring Seibert from ever serving as a ERISA fiduciary again. (Doc. # 1).  However, on October 27, 2010, the Secretary dropped that request for relief as redundant, indicating that another court in Oklahoma has already granted such an injunction. (Doc. # 42 at 6; Case No. 5:06-cv-1330, Doc. # 44).

and that Seibert's Plan account balance should be offset against this loss.  The motion for summary judgment is ripe for the Court's review and will be addressed below.

## II.  **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that

7

there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response

consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. <u>Analysis</u>

The Secretary asserts that summary judgment is appropriate because the Plan in question is an ERISA plan, Seibert was a Plan fiduciary, and Seibert caused the Plan to engage in prohibited transactions involving at least 3.85 million dollars. In addition, the Secretary submits that Seibert's Plan account can be offset despite any anti-alienation provision due to the exception set forth in ERISA § 206(d)(4)(A)(ii).

Seibert, on the other hand, disputes that the Plan was an ERISA plan, and denies that he engaged in prohibited transactions. In addition, he asserts that the case is barred by the running of the statute of limitations and by the doctrine of collateral estoppel. He also launches a variety of arguments concerning the evidence before the Court.

### A. <u>ERISA Requirements</u>

29 U.S.C. § 1109(a) states:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good

> to such plan any losses to the plan resulting from
> each such breach . . . and shall be subject to such
> other equitable or remedial relief as the court may
> deem appropriate, including removal of such
> fiduciary.

Under ERISA's statutory framework, the Secretary must establish that (1) the Central Home Care Services, Inc. and Affiliates 401(k) Plan was a covered Plan; (2) Seibert was a Fiduciary; and (3) Seibert breached his fiduciary duties resulting in loss to the Plan.

### 1.   The Plan was an ERISA Plan

ERISA defines a covered employee benefit plan to include "employee pension benefit plans." 29 U.S.C. § 1002(2).  An employee pension plan is denied as "any plan, fund, or program" which is "established or maintained by an employer or by an employee organization, or both, to the extent that . . . such plan, fund, or program . . . provides retirement income." 29 U.S.C. § 1002(2)(A).

The Central Home Care Services, Inc. and Affiliates 401(k) Plan was a covered ERISA plan because it was established by Central Home Care Services, Inc. to provide retirement income to Central Home Care Services, Inc. employees.  The Court has reviewed the Plan and is satisfied that it is an ERISA plan.  Seibert's general contentions to the effect that the Plan was not governed by ERISA are

unsupported and wholly unsubstantiated.

### 2.   Seibert was a Plan Fiduciary

ERISA provides that a person is a "Fiduciary" to the extent that "he exercises any discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). In addition, the Court has held that an ERISA Plan's "fiduciary" is defined "not in terms of formal trusteeship, but in *functional* terms of control and authority over plans, thus expanding the universe of persons subject to fiduciary duties and to damages  . . ." Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993)(emphasis in original). Here, it is not disputed that Seibert was a Plan fiduciary. He was the Plan Administrator and sole Trustee of the Plan until he was removed via judicial decree. (Seibert Dep. Doc. # 37 at 11).

In additional to holding "fiduciary" titles, he had actual, functional control of the Plan assets.  Thus, the Court finds that Seibert was a Plan fiduciary.

### 3.   Seibert Breached his Fiduciary Duties

The duties imposed on ERISA fiduciaries are the "highest

11

known to the law." <u>Donovan v. Bierwirth</u>, 680 F.2d 263, 272 n.8 (2nd Cir. 1982).  Justice Benjamin Cardozo famously described the standards of a fiduciary as follows:

> Many forms of conduct permissible in a workday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.

<u>Meinhard v. Salmon</u>, 249 N.Y. 458, 464, 164 N.E. 545, 546 (N.Y. 1928).

An ERISA fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1).  Furthermore, ERISA plan fiduciaries must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims." 29 U.S.C. § 1104(a)(1)(B).

In his July 12, 2006, plea agreement entered in case 8:06-cr-373 (Doc. # 4), Seibert admitted to a series of prohibited transactions in breach of his ERISA fiduciary

duties.     As   noted   above,   he   was   charged   with
theft/embezzlement   from   an   employee   benefit   plan,   and   he
admitted that he "as trustee" "diverted and embezzled monies,
by transferring the monies from the Pension and Medical Plans
to a shell corporation, Health Care International Holdings,
Inc. ("HCI"), which was an entity created by [Seibert and
Golden] that had no revenues, other than interest income, and
de minimis assets." (Doc. # 37-1 at 16, ¶ B).

       Seibert also admitted that he "caused approximately $3.85
million in funds to be transferred" from the Plan to Health
Care International Holdings, Inc. in exchange for worthless
bonds. (Id. at ¶ E).   The admissions made in the plea
agreement are corroborated by the   Affidavit of Lizabeth
Valencia,   a   Senior   Investigator   for   the   United   States
Department   of   Labor   (Doc.   #   36-1),   an   individual   who
investigated this case.[6]   In addition, while Seibert now
denies some of the facts stated in the embezzlement plea
agreement, during his deposition, he admitted to the conduct
that forms the fiduciary breaches here: taking millions of

       [6] Seibert challenges the admissibility of Valencia's
affidavit under Federal Rule of Evidence 105.   However,
Seibert has not explained why the Court should apply Rule 105
to the document, and the Court is not persuaded that its
review of the affidavit should be constrained by Rule 105
during these summary judgment proceedings.

dollars from the employee pension Plan and diverting it into his "agencies" for his personal gain.

This conduct specifically violated the "Prohibited Transactions" section of ERISA. 29 U.S.C. § 1106(a) states:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . .
>> (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

Seibert's conduct also violated Section 1106(b)(1) which states that a fiduciary must also not "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

Seibert's conduct in this case is clearly and unquestionably in violation of these ERISA safeguards. Seibert contends that, due to the "severe financial hardships" he was facing, his decisions as plan Fiduciary were "exempt" from ERISA. (Doc. # 40 at 1). 29 U.S.C. § 1108 does list "exemptions from prohibited transactions." However, Seibert has completely failed to show how his conduct qualified as exempt under ERISA laws.

Seibert has not pointed to any evidence in the record to refute the evidence presented by the Secretary as proof that Seibert violated the ERISA laws and caused substantial damage

14

to the Plan.   In addition, Seibert has not articulated a genuine issue of material fact which precludes the entry of summary judgment in favor of the Secretary.   Rather, Seibert contends that the Federal Rules of Evidence bar this Court from considering his deposition testimony and his guilty pleas.[7]   The Court will address these contentions separately.

**B.   Deposition Testimony and Plea Agreement Admissions**

Seibert asserts that the Court should not consider his deposition testimony because he was not able to adequately prepare for the deposition.   Specifically, he contends that the Secretary was required to provide him a list of the deposition questions prior to the deposition, and that the Secretary failed to do so.

The Court rejects Seibert's misguided argument.   Had the Secretary completed Seibert's deposition by written questions pursuant to Rule 31 of the Federal Rules of Civil Procedure, the Secretary would have been required to submit her deposition questions to Seibert.   However, the deposition was conducted live on June 16, 2010, before a Court reporter.

---

[7] The Court does not find the plea agreement entered in the Medicare fraud case (Doc. # 37-2) relevant to the present case, and has cited to it for the presentation of background information only.   The plea agreement in which Seibert admitted to embezzlement, however, is a different story (Doc. # 37-1).

Under these circumstances, the Secretary was not required to furnish her deposition questions to Seibert in advance of the deposition.

In addition, Seibert contends that Federal Rules of Evidence 403, 404(b), and 410 apply to prevent this Court from considering his plea agreements entered in the criminal cases described above.

### 1. **Rule 403**

Rule 403 of the Federal Rules of Evidence, states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Since this case is set for a bench trial (See Doc. # 51), rather than a jury trial, the Court determines that Rule 403 is inapplicable. As stated by the Eleventh Circuit in Woods v. United States, 200 F. App'x 848 (11th Cir. 2006):

> [T]he part of Rule 403 that authorizes exclusion of evidence because of its unfair prejudicial impact has no logical relationship to bench trials. Rule 403 assumes a trial judge is able to discern and weigh the improper inferences that a jury might draw from certain evidence, and then balance those improprieties against probative value and necessity. Certainly, in a bench trial, the same judge can also exclude those improper inferences from his mind in reaching a decision.

Id. at 853.

Even if this case was set for a jury trial, rather than a bench trial, the Court would be hesitant to exclude the relevant plea agreement under Rule 403. The Eleventh Circuit has instructed that Federal Rule of Evidence 403 should be applied to exclude relevant evidence in very limited circumstances:

> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its probative force.

United States v. Sawyer, 799 F.2d 1494, 1506 (11th Cir. 1986)(emphasis in original).

It is well known that Rule 403 should be used sparingly, United States v. Sawyer, 799 F.2d 1494, 1506 (11th Cir. 1986), and Seibert has not presented convincing arguments to the Court concerning why the extraordinary measure of excluding probative evidence should be employed to exclude the highly probative admissions in his plea agreement for embezzlement.

## 2.   **Rule 404(b)**

Federal Rule of Evidence 404(b) provides, "Evidence of

17

other crimes, wrongs, or acts is not admissible to prove the
character of a person in order to show action in conformity
therewith.  It may, however, be admissible for other purposes,
such as proof of motive, opportunity, intent, preparation,
plan, knowledge, identity, or absence of mistake or accident
. . . ." Fed. R. Evid. 404(b).  Rule 404(b) is applicable in
both criminal and civil cases. <u>Huddleston v. United States</u>,
485 U.S. 681, 685 (1988).

Seibert's Rule 404(b) arguments fare no better than his
Rule 403 arguments.  The Court has not used evidence of other
crimes or acts to arrive at its finding that Seibert committed
the conduct alleged in the present case.  The plea agreement
in the embezzlement case contains factual admissions against
interest made by Seibert.  The basis for admissibility of the
plea agreement in the embezzlement case is that it contains
declarations made by Seibert against his interest, rather than
the plea agreement itself constituting independent, objective
evidence that Seibert committed the conduct alleged in the
complaint in this case.

Upon due consideration, the Court determines that Rule
404(b) does not preclude the Court from relying on the
corroborated admissions made in Seibert's embezzlement plea
agreement.

18

### 3. <u>Rule 410</u>

Rule 410 of the Federal Rules of Evidence provides in pertinent part:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
> (1) a plea of guilty which was later withdrawn;
> (2) a plea of nolo contendere;
> (3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure or comparable state procedure regarding either of the foregoing pleas; or
> (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Seibert contends that Rule 410 is applicable because at least one of his criminal convictions is subject to a Section 2255 collateral attack. There is no basis for Seibert's contention. If Seibert's plea agreements had been effectively withdrawn or set aside, the Court would not rely upon any statements made in such plea agreements. However, at this juncture, the plea agreements at issue are effective, and the admissions made therein are binding on Seibert.

In conclusion, Rules 403, 401, and 410 do not bar the Court from relying on admissions made by Seibert in the relevant plea agreement.

19

Thus, after due consideration of all of the evidence in a light most favorable to Seibert, the Court finds that Seibert breached his fiduciary duties under the Plan.  Among other breaches, Seibert violated 29 U.S.C. §§ 1106(a) and (b)(1).  The Secretary has established that these breaches caused damage to the Plan as alleged in the complaint. Seibert however, asserts that, even if he did breach his fiduciary duties, the Secretary cannot prevail because: (1) the Secretary's claims are barred by the statute of limitations; (2) the Secretary's claims are barred by the doctrine of collateral estoppel; and (3) Seibert's Plan account is not subject to being offset.  The Court will address each of these contentions below.

**C.   <u>Statute of Limitations</u>**

Seibert correctly identifies 29 U.S.C. § 1113 as the statute of limitations for bringing this action:

> No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part [29 U.S.C. §§ 1101, et seq.], or with respect to a violation of this part [29 U.S.C. §§ 1101, et seq.], after the earlier of --
> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in this case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

20

> except that in the case of fraud or concealment,
> such action may be commenced not later than six
> years after the date of discovery of such breach or
> violation.

29 U.S.C. § 1113.

In furtherance of his statute of limitations argument, Seibert alleges in his response to the motion for summary judgment: "The Department of Labor investigator was on the premises of the sponsor companies for auditing reasons in 2000 and involved in a raid in 2002. By any rational calculation, the Plaintiff was aware of the actions of the Defendant in 2000." (Doc. # 40 at 2).

As asserted by the Secretary, Seibert fails to point to any evidence regarding the alleged investigation and raid, and Seibert specifically fails to identify the investigator or show that such investigator actually audited the prohibited transactions that are the subject of these proceedings.

The Secretary submits that the Employee Benefits Security Administration first received notice of Seibert's ERISA violations on November 1, 2001, when Rick Hoye, an investigator with the United States Attorney's Office, reported unusual transactions in Central Home Care Services, Inc.'s bank records. (Doc. # 42 at 4). Therefore, the three year statute of limitation for actual knowledge would have expired on October 31, 2004, and the six year statute of

21

limitation would have expired on April 8, 2005. (<u>Id.</u>)

The Secretary's August 24, 2009, commencement of this action against Seibert was nevertheless timely, despite the dates noted above, because Seibert and the Secretary entered into several "tolling agreements" that tolled the running of the statute of limitations for this action.  The Secretary filed each applicable tolling agreement. (Doc. # 42-1).  The first tolling agreement was entered into on October 28, 2004. Because this tolling agreement was entered into prior to the running of the statute of limitations and because such agreement was extended beyond the date that this action was filed, the Secretary's action is not time barred.

   D.   **Collateral Estoppel**

Seibert also contends that the doctrine of collateral estoppel bars the Secretary from pursuing this action.  He specifically asserts that previously litigated Iowa and Oklahoma civil actions bar the present case from going forward.  In <u>Agripost, Inc. v. Miami-Dade County</u>, 195 F.3d 1225, 1229 n. 7 (11th Cir. 1999), the court explained, "Collateral estoppel bars identical parties from relitigating issues that were actually adjudicated in a prior proceeding."

Seibert's contentions are unavailing.  The record shows that the Secretary and the Department of Labor were not

22

parties to any prior proceedings regarding the matters at issue in this suit. Seibert was the defendant in an Iowa qui tam civil action brought by various relators and the Department of Justice on behalf of the United States Department of Health and Human Services based on Seibert's health care/Medicare fraud violations. That case was styled United States of America v. Floyd W. Seibert; Central Home Care Services, Inc.; Central Texas Home Health Services, Inc.; and Central Oklahoma Care at Home, Inc., 4:04-cv-10343. There, Seibert and the Government entered into a settlement agreement dated August 30, 2007, which disposed of the civil case.

As noted by the Secretary "the Department of Labor was not a party to the action, and the case did not involve ERISA, the prohibited transactions or any money owed to the pension plan." (Doc. # 42 at 5). The settlement agreement "specifically reserved and excluded from [its] scope" "the following claims of the United States: . . . Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct." (Case No. 4:04-cv-10343 Doc. 89 at 5, ¶ 5). Thus, collateral estoppel is not invoked by the Iowa civil proceedings.

In addition, the proceedings Seibert initiated in the

Western District of Oklahoma (Case NO. 5:06-cv-1330) do not
bar the present action under the doctrine of collateral
estoppel. Seibert initiated the Oklahoma civil action by
petitioning the district court to remove him as the sole Plan
Trustee.  The Secretary was involved in that suit only to the
extent that she recommended a replacement fiduciary for the
Plan.  On April 4, 2007, the Oklahoma court entered an order
that removed Seibert as Plan Trustee, appointed a Successor
Trustee, and barred Seibert from further fiduciary positions.
(Case No. 5:06-cv-1330, Doc. # 44).  During the time that
Seibert was involved in the aforementioned Oklahoma action, no
claim was asserted or settled concerning monies owed to the
Plan.

Upon due consideration, the Court determines that the
present action is not barred by the doctrine of collateral
estoppel.

### E.   Plan Account Offsets

Seibert asserts that, even if he is liable for the lost
opportunity costs, his Plan account cannot be offset to assure
payment of the lost opportunity costs due to ERISA's anti-
alienation provision. 29 U.S.C. § 1056(d)(1). That provision,
which generally makes pension plans unavailable to creditors,
states: "Each pension plan shall provide that benefits

24

provided under the plan may not be assigned or alienated."

However, as pointed out by the Secretary, there is an exception to ERISA's anti-alienation provision that applies in circumstances such as the present case. 29 U.S.C. § 1056(d)(4) (A)(ii) provides that the aforementioned anti-alienation provision

> shall not apply to any offset of a participant's benefits under an employee pension benefit plan against an amount that the participant is ordered or required to pay to the plan if the order or requirement to pay arises under a civil judgment . . . entered by a court in an action brought in connection with a violation (or alleged violation) of part 4 of this subtitle.

The Secretary has specifically requested an offset in this case against Seibert's account, and the Secretary has brought this action under part 4 of ERISA.  Therefore, the anti-alienation provision does not apply in this case.

**IV.  <u>Conclusion</u>**

The Court has considered the record as a whole and determines that summary judgment in favor of the Secretary is appropriate.  In conducting its analysis, the Court has considered the evidence in a light most favorable to Seibert, the non-moving party.  In addition, the Court has given Seibert considerable leeway in the presentation of his arguments and analysis due to his status as a pro se litigant. Nevertheless, the Court finds that Seibert breached his

fiduciary duties resulting in lost opportunity costs to the Plan in the amount of $1,253,661.64 and that Seibert's Plan account balance should be offset against this loss.

The Court has considered the arguments advanced by Seibert, including but not limited to arguments concerning the statute of limitations, collateral estoppel, and evidentiary bases, and determines that Seibert's contentions are unavailing.  Therefore, the Court grants the Secretary's motion for summary judgment and directs the clerk to enter judgment in favor of the Secretary and against Seibert.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Hilda L. Solis the Secretary of Labor's Motion for Summary Decision Without a Hearing (Doc. # 36) is **GRANTED**.

(2) The Secretary has demonstrated that Seibert breached his fiduciary duties resulting in lost opportunity costs to the Plan in the amount of $1,253,661.64.  Seibert's Plan account balance shall be offset against this loss.

(3) The Clerk is directed to terminate all pending motions and enter judgment for the Secretary of Labor and against Seibert.

(4) Thereafter, the Clerk is directed to close this case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this <u>4th</u>

day of February 2011.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel and Parties of Record